### FIRST NAT. BANK OF MILES CITY v. STATE NAT. BANK OF MILES CITY.

### In re McINTIRE et al.

(Circuit Court of Appeals, Ninth Circuit. May 2, 1904.)

#### No. 1,008.

1. PARTNERSHIP—DEBTS OF PREVIOUS FIRM—LIABILITY—EVIDENCE.

A partnership agreement provided that the incoming partner should pay $2,500 in cash, and execute to the other partner, who had an established business, notes for the remainder of the purchase price of a half interest in the business, to be determined by an inventory thereafter to be taken. The original partner took sole charge of the financial and accounting part of the business. The inventory was not taken, and the notes were not executed, but the parties continued to do business as partners on an equal

basis. The original partner represented to the incoming partner that his indebtedness only amounted to about $10,000, when in fact it exceeded $30,000; and shortly thereafter he borrowed $10,000 from defendant bank, which he represented to his partner was for the firm's benefit, but which he in fact paid on his personal indebtedness to complainant bank, and thereafter, without his partner's knowledge, executed two notes to complainant in renewal of other notes, a part of his personal indebtedness. *Held*, that the incoming partner did not agree to assume any part of the indebtedness of the old firm, and that the notes so renewed were not chargeable against the new firm's assets in bankruptcy.

2. SAME—NOTICE.

Where a bank had knowledge of facts putting it on inquiry as to whether a member of a firm largely indebted to the bank was authorized to execute notes in the firm name to secure such pre-existing indebtedness, the bank was not entitled to prove such notes as against the firm's assets, in the absence of such authority, notwithstanding the partner executing the notes had implied power, as a member of an ordinary trading firm, to execute notes in the name of the firm.

3. SAME—RATIFICATION.

Where an incoming partner had no knowledge until a very short time before bankruptcy proceedings against the firm were instituted that his partner had executed firm notes to secure the partner's pre-existing indebtedness to a bank, and the books of the firm, if examined by such partner, would not have disclosed the execution of such notes, such incoming partner did not ratify their execution, so as to justify their allowance as a claim against the firm's assets.

Appeal from the District Court of the United States for the District of Montana.

Appellant and appellee were creditors of the firm of McIntire & Middleton, bankrupts. In the proceedings in bankruptcy, appellant filed its claim upon overdrafts and notes against McIntire & Middleton amounting to $18,378.21, principal. The referee allowed the claim, including the interest thereon, in the sum of $19,012.21. The appellee herein then moved the referee to expunge and disallow the claim of appellant upon the ground that they were liabilities of the McIntire Mercantile Company incurred prior to the formation of the partnership of McIntire & Middleton, and had not been ratified. Upon this motion the referee in bankruptcy reduced the claim of appellant to the sum of $15,920.34. Appellee took an appeal to the District Court, and the decision of the referee was affirmed as to the claims allowed, except two notes—one for $2,500, and the other for $4,000—the allowance of which by the referee was reversed. From this order and judgment the appeal to this court is taken.

The facts in the record may be briefly stated as follows: For a number of years prior to July 1, 1900, H. W. McIntire was engaged in business at Miles City, Mont. He afterwards adopted and used the trade-name of McIntire Mercantile Company, and continued the use thereof, as its sole proprietor, and as the owner of its entire stock in trade, until the formation of the partnership between himself and Fred F. Middleton. The new firm of McIntire & Middleton commenced to do business about July 1, but the articles of partnership were not reduced to writing and executed between the parties thereto until July 10, 1900. The agreement of partnership was produced at the hearing, and offered and received as evidence. From the terms thereof, it appears that the partnership was to continue for the term of five years; that the firm name was to be McIntire & Middleton, and they were to engage in the business of buying, selling, and dealing in all kinds of merchandise in Custer county, Mont., at wholesale and retail. Each of the partners was to bestow and give his full time, labor, skill, knowledge, and services to the business of the firm. At the time of the formation of this partnership the entire stock of goods, wares, and merchandise of the aforesaid McIntire Mercantile Company was the property of H. W. McIntire, its sole proprietor, and the same was to be taken over by the new firm of McIntire & Middleton. An inventory and valuation of this stock was to be made, and, when so made and ascertained, Middleton was to

acquire a half interest therein by the payment of $2,500 in cash, and executing to McIntire promissory notes for the remainder of the purchase price of said half interest. Middleton paid the $2,500 in cash, and the firm of McIntire & Middleton went into possession of the stock of merchandise. During the time McIntire was engaged in business, he became and was heavily involved in debt. Most of his indebtedness was held against him by the First National Bank of Miles City. Its form was promissory notes executed either in his individual name, or in the name of the McIntire Mercantile Company. About $20,000 of this indebtedness was in existence at the time of the formation of the firm of McIntire & Middleton. In the division of the work to be done by the partners in the firm, McIntire undertook to keep the books, and took sole charge and assumed control of the financial and accounting part of the business, and Middleton gave his attention to the management of the sale department.

The court below, in its opinion, said: "As to the notes for $2,500 and $4,000, respectively, which are claimed to be firm liabilities of McIntire & Middleton, and which have been allowed by the referee as claims against the estate of said bankrupts, it appears from the evidence that both of these notes are renewals of notes for the same amounts due to the First National Bank from the McIntire Mercantile Company. It is claimed that the firm of McIntire & Middleton assumed these liabilities of the McIntire Mercantile Company at the time of the formation of this firm. I fail to find sufficient evidence in the record to support this claim. No consideration appears to have passed from the First National Bank to McIntire & Middleton for such assumption. The fact that McIntire deposited the funds of McIntire & Middleton in said bank would not establish this. Certainly the act of assumption of the payment of these notes must be the act of all the partners. McIntire alone would have no authority, by virtue of his partnership relation with Middleton, to make such a contract."

T. J. Porter and Davis, Kellogg & Severance, for appellant.

O. F. Goddard, for appellee.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge (after making the foregoing statement). The questions involved in this case must be determined upon the conclusions which should be drawn from the testimony as to whether or not the partnership agreed to be entered into between McIntire and Middleton was ever consummated by them in accordance with their agreement. Were the two notes referred to in the opinion renewal notes of the McIntire Mercantile Company, and, if so, were they ever authorized or ratified by Middleton, so as to be valid notes against the partnership, if one existed? In short, did the court err in its findings as to the evidence? Did it err in reversing the decision of the referee concerning the two notes—one of $2,500, and the other of $4,000?

The contention of appellant is (1) that the business of the firm of McIntire & Middleton was the continuation, without interruption, of a going business hitherto carried on by H. W. McIntire under the name of the McIntire Mercantile Company; (2) that the mode of conducting the business of the firm clearly shows an intention on the part of both members of the firm to assume all of the indebtedness of the McIntire Mercantile Company, including that represented by the notes; (3) that the evidence, under the rule of law applicable to such cases, is sufficient to require a finding that the indebtedness of the McIntire Mercantile Company, including that represented by the notes in question, was assumed by the firm.

The difficulties encountered and doubts entertained in endeavoring to ascertain the true facts are attributable to the lax methods and careless manner in which the business affairs of McIntire & Middleton were transacted. If business principles had been adopted at the start; if, after the terms of partnership had been agreed upon, an inventory of the stock of goods owned by McIntire had been taken, and the value thereof determined, and Middleton had given his notes in compliance with his agreement, and the books opened under the firm name of McIntire & Middleton, and an account opened with the appellant bank under the firm name—much of the mist of uncertainty which now exists would never have occurred. We are, however, compelled to deal with the testimony as we find it, unsatisfactory as it is, and determine, as best we can, the true inwardness of the transactions, and the rights and liabilities of the respective parties.

The contention of appellant that the partnership was never consummated cannot be sustained. The partnership agreement was in writing. Under it the parties commenced and conducted the business. The statement of facts shows that the partnership was an existing one. It was not, as appellant argues, "suspended in the air," because Middleton had never given the notes to McIntire for the amount due upon his purchase of a one-half interest in the stock of goods. These notes were not given because no inventory had been completed, and until that was done it could not be ascertained what the amount was. From the statement it is also shown that the two notes here in controversy were given as renewal notes of an indebtedness due from H. W. McIntire, individually, under the trade-name of the McIntire Mercantile Company. The national bank knew this to be the fact. McIntire knew it. Both so testified.

The pivotal point of dispute or conflict in the evidence is whether or not the firm of McIntire & Middleton assumed the payment of the indebtedness due by McIntire to the National Bank; secondly, whether the firm, in its methods of transacting business, did not justify such an assumption; and, thirdly, by its conduct ratify the acts of McIntire in giving the two notes in the firm name.

One transaction that is relied upon by appellant to support its contention that the firm of McIntire & Middleton assumed the indebtedness of the McIntire Mercantile Company to the appellant bank is that McIntire had promised appellant that, if the partnership of McIntire & Middleton was organized, it would pay appellant $10,000 very soon. Now, it appears that the State Bank, appellee herein, had been approached by McIntire, with the knowledge of Middleton, and conversations had with reference to the amount of money which appellee would agree to allow the firm to overdraw or loan if it should open an account and transact the firm's business through the bank, and the bank agreed to the sum of $10,000. McIntire very soon thereafter, in July, 1900, went to the State Bank and borrowed $5,000 on account of McIntire & Middleton, and took this money over to the National Bank, and there deposited it to the credit of the McIntire Mercantile Company. In December, 1900, or January, 1901, McIntire borrowed on account of McIntire & Middleton another $5,000 from the State Bank, and deposited it with the First National Bank to the credit of the Mc-

Intire Mercantile Company. It is not shown, except by inference from the evasive testimony of McIntire, that Middleton had any knowledge of how this money was to be applied. The extent of Middleton's knowledge in this matter, as shown by the record, is to the effect that he knew McIntire drew some money from the State Bank—as he supposed, to pay debts owing by the firm of McIntire & Middleton; he did not know that McIntire used the money, or any part of it, to pay the debts of the McIntire Mercantile Company.

There were certain checks drawn and notes given to the appellant bank, signed by the firm name of McIntire & Middleton, for debts due by the firm; and some of them, at least, were known by the bank to be for debts of the firm, which are relied upon to show an assumption of the debt due the bank by the McIntire Mercantile Company. The bank itself, by allowing these matters to be mixed up with the accounts of McIntire, and not opening an account with McIntire & Middleton, and keeping the accounts separate, contributed to the conditions of which it now seeks to avail itself. It could not have been misled upon its own irregular conduct touching these matters. Neither the appellant nor McIntire was able to give any sensible reason for the method adopted of keeping the accounts together.

Notwithstanding these facts, it may, for the purposes of this opinion, be conceded that there were two or three of these transactions, which, if taken by themselves, unexplained, without reference to other undisputed facts, might tend to support appellant's views. But it is our duty to take all the facts, the circumstances, conditions, and surroundings of the parties, their financial condition, and methods of drawing checks and depositing money, etc. If it was the firm's understanding that such indebtedness had been assumed, is it likely that Middleton, as a sane man, would have agreed to give his notes to McIntire for one-half of the inventoried stock of goods? The articles of copartnership stated "that the common stock of the partnership consists of money and merchandise of the full value of $30,000"; that "the shares of the said partners in the profits or loss of the business are and shall be equal." The half interest in this property would be worth say $15,000. For this Middleton had agreed to give his notes. Would he have agreed to do this if it was the understanding that the firm was to assume the individual indebtedness of McIntire?

The testimony shows that, when the partnership was talked about between them, McIntire told Middleton that his indebtedness was only about $10,000, and that he would be able to arrange that before July 1, 1900. The testimony also shows that McIntire's indebtedness was at that time, and at the time the partnership was entered into, over $30,-000. Middleton was not aware of this indebtedness. The First National Bank, appellant herein, knew of this indebtedness of McIntire, because the greater part of it was then owing to the bank, and it knew of the formation and existence of the partnership between McIntire and Middleton; and it never made any inquiry whatever of Middleton as to whether the partnership had assumed the indebtedness of McIntire, but relied and acted solely upon the statement made to it by McIntire.

W. B. Jordan, the president of the First National Bank, testified that he was acquainted with both McIntire and Middleton, and was in-

formed of the transaction of their going into business together as partners; that about the time of the formation of the partnership he had a talk with McIntire about his business, as he was largely indebted to the bank. Among other things, he said:

"I advised Mr. McIntire to enter into this partnership, and that we would take them for the indebtedness of H. W. McIntire and McIntire Mercantile Company to the bank. His assurances to me were that, if the firm of McIntire & Middleton was formed, that they would pay $10,000 to the First National Bank very soon, and reduce their indebtedness right along. I left here in a few days, and when I came back the firm of McIntire & Middleton was in operation."

Upon his cross-examination:

"Q. Mr. Jordan, with what member of the firm of McIntire & Middleton was this conversation relative to the new firm of McIntire & Middleton assuming the debts of the McIntire Mercantile Company? A. With Mr. McIntire. Q. You never at any time talked with Mr. Middleton about that? A. No, sir. * * * Q. Mr. Jordan, can you tell why that account was continued in the bank under the name of the McIntire Mercantile Company after the new firm was formed? A. I cannot. It was simply allowed to run along that way, and I asked the cashier if there had been any change, and there had not been any. It was just going along the same as before."

McIntire corroborated the statements made by Jordan. Upon McIntire's cross-examination:

"Q. Now, I will ask you, Mr. McIntire, why you kept the account with the First National Bank of McIntire & Middleton in the name of McIntire Mercantile Company? A. I do not know that I had any particular reason for doing that. The necessity of changing it did not occur to me at all. Q. Wasn't it mentioned to you by Mr. Middleton once or twice? A. Not that I remember. Q. Didn't he call your attention to it, and ask you to change it, or to change the account to the State National Bank? A. I do not remember any such conversation. By the way, I do remember having— Mr. Middleton understood that the account was to go to the State National Bank, but, so far as my recollection serves me, there was no discussion of this account between Mr. Middleton and myself. Q. You can give no good reason why you kept this account in the way you did? A. No; I cannot."

Middleton testified that he never consented, authorized, or agreed in any manner to assume the indebtedness of McIntire to the National Bank, and that the partnership never assumed the indebtedness. With reference to the two notes here in controversy, there is no evidence tending to show that Middleton ever knew of their existence until about the time of the filing of the firm's petition in bankruptcy. There is no sufficient evidence in the record to sustain the contention of appellant that the firm of McIntire & Middleton ever assumed the indebtedness of McIntire, or the McIntire Mercantile Company, in its entirety, to appellant. The weight of the testimony clearly shows that the partnership never assumed the payment of the two notes which are involved in these proceedings, and never authorized the giving of the notes. Surely McIntire alone had no authority to make the contract of renewal. Appellant, having notice of the facts, was put upon inquiry, and is not in a position in the bankruptcy proceedings, as against a creditor or creditors of the bankrupt firm, to maintain its claim for the allowance of the two notes—one for $2,500, and the other for $4,000.

It is a well-settled rule of law that it is the duty of all the members of a copartnership to observe the utmost good faith toward each other

in all their partnership transactions. This rule becomes essential because the members of the partnership stand in a fiduciary relation to each other. 22 Am. & Eng. Ency. L. (2d Ed.) 114, and numerous authorities there cited. The doctrine thus announced bears upon the conduct of the appellant bank. Did it have the right to assume that the conduct and statement made by McIntire, as testified to by its president, were authorized by the members of the firm of McIntire & Middleton? Was it not then and there put upon notice that it was doubtful, to say the least, if McIntire was authorized to make such a statement? It had no knowledge that Middleton knew the amount of McIntire's indebtedness to the bank. The amount was so large as to cast suspicion upon the part of the bank and its officers, and put them on inquiry as to the truth of McIntire's statement.

In 1 Lind. on Part. p. 413, § 171, the author says:

"A person who knows that a partner is using the name or assets of the firm for a private purpose of his own knows that he is prima facie committing a fraud on his copartners. Therefore, notwithstanding the implied power of a member of an ordinary trading firm to accept bills or make notes, if one partner accepts a bill or makes a note in the name of the firm, and gives the bill or note in payment of a private debt of his own, the creditor who takes the bill or note, knowing the circumstances under which it has been accepted or made, will not be able to enforce it against the firm, unless it was in fact given with the authority of the other partners, which it is for the creditor to prove."

In McNair v. Platt, 46 Ill. 211, 213, the court said:

"As a general rule, one partner is not bound by the unauthorized acts of his copartner; but, from the very nature of a partnership, each member of the firm is presumed to have and has authority to bind the firm within the scope of the business of the copartnership. Beyond the scope of its business, authority to act must be shown, precisely as if any other person had performed the act, or the firm will not be bound. The application of partnership funds or property to the payment of a debt of one member of the partnership is outside of and beyond the scope of its business, and assent to such application must be shown, or a subsequent ratification proved, or the firm will not be bound."

It is unnecessary to multiply authorities upon this point. The books are full of cases where this principle is announced. There are none to the contrary. It was this principle that authorized the allowance of many of the accounts by the court that were included by the bank in the McIntire Mercantile Company. The fact is that the court allowed all the accounts that were proven in good faith to belong to the partnership of McIntire & Middleton; otherwise all the accounts should have been disallowed on the general principle that they were charged to McIntire alone, and the appellant bank did not upon its books appear to be a creditor of McIntire & Middleton. The court took an equitable view of this matter in order to reach the ends of justice, and recognized the appellant bank as a creditor of the firm, and entitled to share with other creditors to the extent that it had proven it was in fact a creditor of the firm. This equitable view, however, could not be extended to the transaction of the renewal of the two notes unless the firm had agreed to assume the indebtedness of the McIntire Mercantile Company, because the bank knew that the renewal notes were given for the private debt of McIntire. The law is well settled that one partner

cannot bind the firm by giving a note to pay his individual debt unless authorized so to do by his partner. Such a transaction is treated as a fraud upon the partnership. 1 Bates on Part. §§ 347, 509, and authorities there cited; Elkin v. Green, 13 Bush, 612; Lanier v. McCabe, 2 Fla. 32, 48 Am. Dec. 173; Thomas v. Stetson, 62 Iowa, 537, 17 N. W. 751, 49 Am. Rep. 148; Howell v. Sewing Machine Co., 12 Neb. 177, 10 N. W. 700; Bank of Scott City v. Sandusky, 51 Mo. App. 398, 401; Brobston v. Penniman, 97 Ga. 527, 25 S. E. 350.

In Shirreff v. Wilks, 1 East, 48, decided in 1800, Lord Kenyon, C. J., said:

> "This is an action brought against three persons, Wilks, Bishop, and Robson, as acceptors of a bill of exchange. It appears that the acceptance was in fact made by Bishop alone in the name of the firm. The consideration for this bill was some porter which had been sold by the plaintiffs to Wilks and Bishop only, at a time when Robson had no concern with the house. Then the plaintiffs, knowing this, draw the bill upon all the three partners, and knowingly take an acceptance from one of them to bind the other two, one of whom, Robson, had no concern with the matter, and was no debtor of theirs; no assent of his being found, and nothing stated to show that he had any knowledge of the transaction. It is hard enough for one partner in any case to be able to bind another without his knowledge or consent, but it would be carrying the liability of partners for each other's acts to a most unjust extent if we suffered a new partner to be bound in this manner for an old debt incurred by other persons. The plaintiffs therefore ought not, in justice, to have taken this security, by which they were to bind one who was not their debtor. The transaction is fraudulent upon the face of it."

There is nothing in the course of dealing of the firm of McIntire & Middleton, irregular as it was, that could have misled the appellant bank, and induced it to accept the renewal notes under the belief that the firm had assumed the payment of McIntire's debt to the appellant bank.

In People's Savings Bank v. Smith & Co., 114 Ga. 185, 188, 39 S. E. 920, the court held that a partnership may frequently have drawn checks against its funds in bank for the purpose of discharging the individual debts of its members would not constitute such a course of dealing as would justify the bank in assuming that it was within the scope of the partnership business to pledge its credit and give its promissory note in satisfaction of a debt due by one of the partners to the bank.

In order to ratify the act of McIntire in giving the notes in question, it must at least have been shown that Middleton had knowledge thereof. The foundation upon which the principle of ratification is based is wanting in this case. In the very nature of the facts, as disclosed by the testimony, there could not have been any ratification upon the part of Middleton, for he never heard of the $2,500 note until a very short time before the proceedings in bankruptcy were instituted, and there is no pretense that he then consented to it. His first knowledge of the $4,000 note was at the first meeting of the creditors before the referee in the bankruptcy proceedings. In Reubin v. Cohen, 48 Cal. 545, the court held that the mere fact that a partner, upon being informed that his copartner had given a firm note for his individual debt, does not deny his liability thereon, does not per se amount, in point of law, to a ratification or adoption of the note.

Some reliance seems to be placed upon the point that it is the duty of the court to assume in this case that Middleton had access to the firm books, and obtained knowledge therefrom. Middleton testified that he could have had access to the books of the firm, but that he had never examined them. There was no evidence upon this point except the testimony of Middleton. No inference could therefore be drawn as to his knowledge of what the books contained. The books introduced in evidence in this case did not contain any entries with reference to the notes in question, and Middleton could not have obtained any knowledge in regard to them if he had examined the books. The ordinary presumption undoubtedly is that all the partners have access to the partnership books, and know of the entries therein; but this is a mere presumption from the ordinary course of business, and may be repelled by any circumstances which lead to a contrary presumption. United States Bank v. Binney, 5 Mason, 176, Fed. Cas. No. 16,791.

The judgment of the district court is affirmed, with costs.